[No. 3209.]

## AMERICUS MADISON *v.* THE STATE.

1. THEFT.—A fraudulent taking is a necessary and an indispensable element of theft. In order to constitute that offense under our law it is not necessary that the property be removed any distance from the place of taking; it is sufficient if it has been in the possession of the thief, though it may not be moved out of the presence of the person deprived of it, nor is it necessary that any definite length of time shall elapse between the taking and the discovery thereof; if but a moment elapse, the offense is complete.

2. SAME—FRAUDULENT TAKING—POSSESSION—CHARGE OF THE COURT.— The facts in this case showed that the defendant, who claimed to own hogs running in the same range where the hogs in question were found,

said that he supposed they belonged to him, called them up, and sold them to a third party, who, a day or two afterwards, took possession. The court, in substance, charged that the mere sale of the hogs was equivalent to a taking. *Held*, error; that in order to amount to theft, the seller of the stolen property must have had some manner of possession of the property. The rule is invariable that there must be an actual taking or a conversion of the stolen property in order to support a conviction for theft. See the opinion *in extenso* on the question.

3. SAME—APPROPRIATION.—Consistent with the doctrine stated is the rule that, "if the thief fraudulently procure a person innocent of any felonious intent to take the goods for him, his offense will be the same as if he had taken the goods himself." See the opinion and statement of the case for evidence *held* sufficient under this rule to show a taking and appropriation by the defendant.

4. SAME—INTENT—FACT CASE.—But see the statement of the case for evidence *held* insufficient to disclose a fraudulent intent, and therefore insufficient to support the conviction.

APPEAL from the District Court of Walker. Tried below before the Hon. J. R. Kennard.

The conviction was for the theft of twenty hogs, the property of R. H. Cabiness, of the aggregate value of forty dollars, in Walker county, on the tenth day of March, 1883. A term of two years in the penitentiary was the punishment awarded.

R. H. Cabiness was the first witness for the State. He testified that, early in March, 1883, he left his home to look after his stock. The creek running near his house was so swollen that he left his horse and crossed over on a foot log, and went into the field in which the residence of Mr. Grooms was situated. He found Mr. Grooms penning some hogs in a close pen that he had recently made. Witness asked Grooms about the hogs that he was then penning, and ascertained from him that he had purchased them from the defendant. Witness informed Grooms that those hogs were his. The bunch included seventeen shoats and three sows. Grooms had butchered one of the sows, and was on the eve of marking the shoats, which at that time were unmarked. The animals described were perfectly gentle, and would readily answer to call. Witness had the defendant sent for, and he came to Grooms's place. Witness asked the defendant why he had traded his hogs to Grooms. The defendant replied that they looked like his hogs—a bunch that he had purchased from Mr. Roberts, and that he took them to be that same bunch. Some one asked the defendant what he proposed to do about the hog Grooms had killed—if he was going to pay for it.

He answered that that was Mr. Grooms's business, or that Grooms would attend to that, as it was Grooms that killed the animal. The witness remarked, in reply, that he did not want pay for the hog, as he intended to prosecute the defendant for taking the animals.

Cross-examined, the witness stated that his mark was a swallowfork in one ear and a split in the other. He found his hogs as stated, and sent for the defendant on or about the tenth day of March, 1883. He took his hogs home on the same day, and on that same evening went to Huntsville and lodged complaint against the defendant, charging him with the theft of the hogs, twenty in number. He made this complaint before a justice of the peace. The complaint, bearing date March 10, 1883, was here exhibited. On the Monday following the Saturday on which the hogs were recovered and the complaint filed, the defendant came to the witness's house, having a hog in his wagon which he offered the witness in the place of the one Grooms had killed. The witness hesitated about accepting the hog, but finally told the defendant that he would accept the hog in payment for the one killed by Grooms. He directed the defendant to put the hog in his, witness's, lot, which he did. Witness thereupon turned the hog over to a colored man. He did not, on that occasion, tell the defendant that he had been to Huntsville and filed a complaint against him for stealing the hogs. The defendant did not, at the time that he made restitution for the hog killed by Grooms, know that the complaint for theft had been filed. Witness was of the impression that the defendant knew his, witness's, mark, as two years before, he, the defendant, had attended to and milked some of witness's cows in that mark. When the defendant milked the cows spoken of he lived about nine miles from the place where he lived when he sold the hogs to Grooms. Witness owned three sows in the lot the defendant sold to Grooms, one a black sow, one a brown or sandy sow with spots about on her body, and the other a spotted sow. Grooms's place was about two and a half miles distant from witness's residence. The witness identified the defendant, and stated that the hogs were owned by him, witness, and were taken without his consent, in Walker county, Texas, on or about March 10, 1883.

The witness Grooms testified, for the State, that he traded for a bunch of hogs with the defendant; that at the time he made the trade the hogs were running in his, witness's, field; that he

informed the defendant that the hogs were in the field, and the defendant said that he thought they were his, the. defendant's, hogs, as he had hogs running in the same range with the Cabiness hogs. Witness made the trade with the defendant for the hogs on Thursday. On Saturday following, while he, witness, was putting the hogs in a small pen for the purpose of marking the shoats, Cabiness came up and claimed the hogs as his. The defendant was then sent for, and came to the hog pen. Cabiness told the defendant that the hogs belonged to him, Cabiness. Defendant replied that the hogs looked like his, and he thought that they were his when he traded them to the witness. The hogs, except one open sow, which the witness had killed, were taken away by Cabiness.

Cross-examined, the witness stated that the defendant owned a bunch of hogs that ran on the same range with the Cabiness hogs. About eight days after the hogs traded for were identified as Cabiness's hogs, the defendant found his hogs, and turned them over to the witness for the same consideration that had been paid on the trade for the Cabiness hogs. The defendant had a fine lot of hogs, numbering about thirty head of shoats, and four or five sows. Of the Cabiness hogs described, the witness bought of defendant eleven shoats and three sows. One of the sows was black in color, another was a sandy animal with some white spots about the body, and the other was spotted. The sows witness last bought of the defendant were marked with a crop and split in one ear, and a crop and upper half-crop and underbit in the other. The defendant had a very poor faculty for distinguishing ear marks, and could not now, if required to do so, go out into the court house yard, examine the mark of a hog and return and describe it correctly. Before he traded for the hogs that proved to belong to Cabiness, the witness knew that the defendant owned hogs running on the same range with the Cabiness hogs, not far from where he, witness, lived. He knew that the defendant had not seen his hogs oftener than twice since Christmas, 1882. There were two different ear marks in the second lot of hogs that the witness got from the defendant, one of which was the defendant's mark and the other the Roberts mark. Neither of these marks resembled the Cabiness mark. When the witness bought the Cabiness hogs from the defendant, he and the defendant called the hogs right up to them. They were quite gentle. Witness went to defendant's house after Cabiness claimed the hogs, when, it is the impres-

sion of the witness, the defendant, upon being asked about the mark, said: "That it is the old Cabiness mark." The Cabiness and Roberts mark, except that both had a split in one ear, were totally unlike. The State closed.

Jimmie Smith was the first witness for the defense. He testified that he was present at the Grooms house on the Saturday that Cabiness sent for the defendant to go to Grooms's house. When Cabiness told the defendant that the hogs he had sold to Grooms were his, Cabiness's, hogs, the defendant said that they looked like his own hogs, and that at the time he traded them to Grooms he thought that they were his. The witness knew that the defendant owned hogs running in the same range with the Cabiness hogs when he made the trade with Grooms. He owned a "likely" or good bunch, numbering four or five sows and some thirty pigs, or shoats. The witness owned these hogs originally, but sold them to Roberts, who subsequently sold them to the defendant. Witness heard of this latter sale through both Roberts and the defendant. These hogs had been somewhat dogged, and were therefore inclined to be skittish. The Cabiness hogs were gentle. Witness knew that the defendant had a very poor faculty for distinguishing the ear marks of animals. It is possible that the defendant might be able to distinguish his own hog mark from that of another person, but the witness doubted such fact.

J. W. Robinett testified, for the defense, that he knew that the defendant owned hogs running in the same range with the Cabiness hogs. They were a fine lot, numbering some five or six sows, and some twenty or thirty pigs or shoats. Witness had made an ineffectual effort to trade with the defendant for his bunch of hogs. Witness knew the defendant well. His, defendant's, faculty for distinguishing ear marks of animals was exceedingly poor. He had no ability to identify ear marks at all. Among the hogs owned by the defendant there was a black, a black and white spotted, and a sandy colored sow. This latter had some spots on her body. There was some resemblance between these three and some sows owned by Cabiness.

The proof in this case further showed that the complaint was made before a justice of the peace on March 10, 1883, and that the defendant had no notice of such complaint until he was arrested on the thirteenth day of the following April.

That the verdict was against the evidence, that the court erred in its general charge, and in the refusal to give certain re-

quested charges, were the grounds urged in the motion for new trial.

J. M. Maxcy, for the appellant.

J. H. Burts, Assistant Attorney General, for the State.

White, Presiding Judge. The appellant was convicted of the theft of certain hogs, the property of one Cabiness. Without discussing the many errors assigned, we propose to discuss but two questions, to wit: 1. As to the sufficiency of the facts to establish theft as defined in our Code; and 2, the sufficiency of the evidence to establish the guilt of the defendant.

A fraudulent "*taking*" is the essential element of theft as that offense is defined in our Code. (Penal Code, Art. 724.) At common law, a carrying away or asportation was necessary in connection with a fraudulent taking, but under our Code, "to constitute theft, it is not necessary that the property be removed any distance from the place of taking; it is sufficient that it has been in the possession of the thief, though it may not be moved out of the presence of the person deprived of it; nor is it necessary that any definite length of time shall elapse between the taking and the discovery thereof; if but a moment elapse, the offense is complete." (Penal Code, Art. 726.)

What is a taking under our law? Must actual, manual possession, or the exercise of actual custody and control, be established to constitute a taking? These questions are suggested, and necessary to be determined from the facts in this case. It is shown by the evidence beyond controversy that the appellant sold the hogs to Grooms, and that the hogs belonged to Cabiness. The hogs were running in Grooms's field, who, believing them to belong to defendant, informed the latter that they were in his field. "Defendant said he thought they were his hogs; that he had hogs running in the same range." Witness (Grooms) and defendant called the hogs right at (up to?) them." Defendant sold the hogs to Grooms, and Grooms, the next day, put them into his pen, where they were afterwards found, and claimed by Cabiness.

Was this such a "taking" by defendant as constitutes theft under our statute? At common law there was required to be not only a taking, but asportation also. And Mr. Russell says: "There must be an actual taking or severance of the goods from

the possession of the owner, on the ground that larceny includes a trespass. If, therefore, there was no trespass in taking goods, there can be no felony in carrying them away. But the taking need not be by the very hand of the party accused; so that if the thief fraudulently procure a person innocent of any felonious intent to take the goods for him (as if he should procure an infant within the age of discretion to steal the goods), his offense will be the same as if he had taken the goods himself, and it should be so charged. It appears to be well settled that the felony lies in the very first act of removing the property; and therefore that the least removing of the thing taken from the place where it was before, with an intent to steal it, is sufficient asportation, though it be not quite carried away." (2 Russ. on Crimes, 9 ed., p. 152.)

In the case before us, the hogs were in their accustomed range, and Grooms, after his purchase, did not drive or pen them for a day or so. Did the single act of defendant in selling him the hogs, under the circumstances, amount to theft? At the request of the district attorney, the court charged the jury "that the selling of property belonging to another by one who knows the same is not his own is sufficient in law to constitute a taking as meant in the definition of theft; and if all the other ingredients of theft, as given you in the general charge, are proven, and a taking is shown by a sale of the property, then such sale is a taking under the law."

This charge simply affirms that a sale is equivalent to a taking.

In *Hardeman* v. *The State,* 12 Texas Court of Appeals, 207, Hardeman sold a steer running on the range, the property of one May, to one Wear, and this court said: "The evidence fails to show that the steer was ever in possession of the defendant. To constitute theft, there must be a *fraudulent taking* by some per on. In this case, the defendant did not take the animal, nor did Calvin Wear, to whom defendant sold the animal; and, if Wear had taken the property, his taking would not have been fraudulent, but honest. he having bought and paid for it, and received the bill of sale for the steer. This steer, running on the range all the time, was not taken fraudulently or otherwise by any person, hence there was no theft." This decision fully refutes the proposition announced in the charge given—that a sale alone constitutes a taking. Under the Hardeman decision, it would appear that a defendant must have some sort of possession of the stolen property, else a sale of such property by

him would not amount to theft; and we are of opinion that this proposition is well sustained by authority and reason. There must be an actual taking or conversion of the stolen property to support a verdict of guilty of theft. In *White* v. *The State*, 11 Texas, 771, the Supreme Court say that intention and conversion were both "necessary elements to make out a charge of theft. In all criminal cases nothing is presumed against the accused. The proof must show that there was a conversion, which under the Code is the synonym of taking." (*Martin* v. *The State*, 44 Texas, 172.) In Martin's case the proof was that the owner of the alleged stolen hog, while in his field, heard the report of a gun; advancing he saw, just over a hill, the defendant loading his gun, and on approaching the defendant he saw, about fifteen feet from where defendant was standing, one of his hogs freshly shot. He said to defendant: "That is my hog." Defendant replied: "I did not shoot it." It was held that actual conversion or possession was not shown, and that the intent and act constituting the offense must both exist to make out the offense.

In *State* v. *Wilkerson*, 72 North Carolina, 376: "When A was indicted for stealing a hog, and on the trial it was shown that a hog belonging to the prosecutor had been killed and concealed in the corner of the fence, covered with leaves, and that A was seen at night to go to the place, and look carefully around and stoop over, as if to take the hog, and upon being hailed fled, *held*, that these facts alone would not justify a verdict of guilty."

The case we are considering is not, it will be noticed, precisely similar to any of the other cases we have cited. In this case, though the hogs were in their accustomed range, yet they were gentle and were called up by defendant or Grooms, and were right up at them, in their presence, and could have been immediately driven off by either or both when defendant made his sale and constructive delivery of them to Grooms. Under these circumstances, had not the hogs been "taken," in legal contemplation, by defendant before the sale? He called them up; this was exercising control over them certainly, and, after they came up, and whilst they were thus in his control, if he, knowing them not to be his property, sold and constructively delivered them to Grooms, who afterwards took them into actual possession, under the purchase, it would, in our opinion, bring the case fully within the rule quoted above from Russell, viz: that "if the thief fraudulently procure a person innocent of any felonious intent to take the goods for him, his offense will be the same as

if he had taken the goods himself." The appropriation, so far as defendant is concerned, was obvious, and the taking did not rest solely upon the subsequent exercise of ownership and possession by Grooms.

But, as stated above, the charge given at the request of the district attorney was erroneous.

In addition to this error, we are not satisfied that such fraudulent intent is established by the evidence as warrants the conviction.

Appellant had hogs, which he had bought of Roberts, running in the same range. Grooms believed these to be defendant's hogs. Defendant said that he also believed them to be his. The marks, it is true, were somewhat different, but defendant is shown to be little acquainted with the difference in marks. There was no concealment or attempt at concealment with regard to any part of the transaction by defendant. His actions are not inconsistent with honest and fair dealing, under an honest but mistaken claim of right to the hogs. He certainly promptly and fully righted the wrong, if any had been done, as far as could be by satisfying Cabiness and Grooms in so far as they were likely to be injured by a loss of the hogs alleged to have been stolen.

In our opinion the evidence does not support the verdict and judgment, and in connection with our conclusions upon this point we cite the following cases: *Mullins* v. *The State*, 37 Texas, 337; *McHenry* v. *The State*, 40 Texas, 46; *Clark* v. *The State*, 7 Texas Court of Appeals, 57; *Landin* v. *The State*, 10 Texas Court of Appeals, 63; *Shelton* v. *The State*, 12 Texas Court of Appeals, 513; *Taylor* v. *The State*, Id., 489; *Mapes* v. *The State*, 14 Texas Court of Appeals, 129; *Dresch* v. *The State*, Id., 175.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 14, 1884.